

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV–15–990

SARHA JANE SISEMORE AND JARID SISEMORE

APPELLANTS

V.

ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD

APPELLEES

**Opinion Delivered:** March 30, 2016

APPEAL FROM THE MADISON COUNTY CIRCUIT COURT
[NO. JV-14-70-3 ]

HONORABLE STACEY ZIMMERMAN, JUDGE

AFFIRMED

**WAYMOND M. BROWN, Judge**

Appellant Sarha Sisemore[1] appeals the order of the Madison County Circuit Court that gave permanent custody of her daughter, H.S. (born 05-18-14), to Sonia and Miles Yates and closed the dependency-neglect case.[2] Appellant argues that the court erred by awarding the Yateses permanent custody of H.S. because (1) appellant had made significant and measureable progress toward remedying issues that caused the removal of H.S., and the Department of Human Services (DHS), Court Appointed Special Advocate (CASA), and the attorney ad litem recommended an additional three months to transition H.S. into

---

[1] Jarid Sisemore's motion to dismiss his appeal was granted before this case was submitted.

[2] Sonia Yates is appellant's cousin.

appellant's home pursuant to Arkansas Code Annotated § 9-27-338(c)(3);[3] and (2) because permanent custody with the Yateses was not in H.S.'s best interest where there were serious questions about the care H.S. was receiving in the Yateses' home and where H.S. would be separated from a "full-blooded sibling." We affirm.

DHS took emergency custody of H.S. on October 26, 2014, after she suffered a skull fracture and retinal hemorrhages while in Jarid's custody. On October 29, 2014, DHS filed a petition for emergency custody and dependency-neglect against appellant and Jarid alleging that H.S. was dependent-neglected as a result of parental unfitness and neglect.[4] An ex parte order placing H.S. in DHS custody was granted and filed on October 29, 2014. A probable-cause order was filed on October 31, 2014, finding that the emergency conditions that had necessitated removal of H.S. continued; H.S. should remain in DHS's custody; and it was contrary to H.S.'s welfare to be returned to her parents. DHS was ordered to develop a case plan and appellant was ordered to do a number of things, including (1) call Toni Johnson weekly, (2) not use illegal drugs/alcohol, (3) submit to random drug screens as requested by DHS, (4) obtain and maintain stable housing and employment adequate enough for appellant and H.S., (5) maintain a clean, safe home for herself and H.S., (6) demonstrate ability to protect H.S. and keep her safe from harm, and (7) follow court orders. The order also allowed certain relatives to sit with H.S. at the hospital if the hospital staff determined that H.S. was well enough for visitors.

---

[3] (Repl. 2015).

[4] The petition also named H.S.'s half-brother and his mother, but they are not parties to this appeal.

The adjudication hearing took place on December 5, 2014. Following the hearing, an order was filed adjudicating H.S. dependent-neglected as a result of abuse, neglect, and parental unfitness. The court found that H.S. was subjected to aggravating circumstances due to the severity of her head injuries. The goal of the case was set for reunification, with a concurrent goal of relative placement. H.S. was placed in the custody of Sonia Yates, and appellant was granted supervised visitation for two hours a week. The court found that appellant had not corrected the conditions which caused removal and had not made substantial progress so that reunification could occur within a reasonable period of time consistent with H.S.'s developmental needs. The court ordered appellant to (1) have a psychological evaluation; (2) participate in individual counseling; and (3) complete thirty hours of infant-parenting class before March 1, 2015, and demonstrate improved, appropriate parenting after completion of the classes and provide proof of completion to her DHS caseworker. The prior orders of the court remained in effect. The court also ordered DHS to make all referrals within ten business days, to provide appellant with transportation if needed, to do a home study on appellant and Jarid when they obtained new housing, and to pay for any family services ordered.

A review order was filed on April 3, 2015, finding that a return to appellant's custody was contrary to H.S.'s welfare. The court found that H.S. should remain in Sonia's custody. The court stated that appellant needed to address her mental-health issues through more counseling and ordered her to participate in another round of individual counseling and twelve more hours of parenting classes. The goal of the case continued to be reunification with a concurrent goal of relative placement. The order reflects that appellant had complied

with some of the court orders and the case plan and that she had made some progress toward alleviating or mitigating the cause of H.S.'s removal from the home. However, the court noted that appellant had not maintained stable housing and employment. Appellant's visitation was extended to two more hours on Sunday, with her mother, Denise Gray, supervising it. However, the court stated that any contact between Carlous Gray, appellant's father, and H.S. had to be supervised.[5]

On May 5, 2015, the attorney ad litem, Diane Warren, filed a motion to suspend appellant's supervised Sunday visitations with H.S. In the motion, Warren alleged that H.S. returned from a Sunday visit with a physical mark on her thigh and that appellant's explanation that H.S. received the injury from crawling on the floor was inconsistent with the marks. The court entered an order on May 8, 2015, suspending appellant's Sunday visitations. Appellant filed a response to the motion to suspend visitation and a motion to set aside the order suspending visitation on May 22, 2015. She included pictures of H.S. and of the Yateses' bathtub to support her contention that the allegations of abuse were manufactured by the Yateses and that H.S. should be removed from the Yateses' custody. The court entered an order on May 22, 2015, reinstating appellant's supervised visitation; however, the day was changed from Sunday to Friday.

At the permanency-planning hearing (PPH), DHS, CASA, and the attorney ad litem recommended that appellant be given an additional three months to transition H.S. into

---

[5] At some point, a home study of the Grays was conducted. It was admitted as an exhibit by appellant. The study reflected that there was a past true finding of child maltreatment on Carlous against appellant in 2006. The Gray residence was approved for placement under the condition that Carlous did not live in the same house.

appellant's home. Antoinette Johnson, the DHS family service worker, testified that she believed appellant had made significant and measurable progress toward the case-plan goals and that appellant was working diligently toward reunification. She opined that appellant's case should be extended to a fifteen-month PPH. She also recommended that appellant's visitation with H.S. be extended and unsupervised so that H.S. could slowly transition into appellant's home. However, Johnson said that H.S. was "highly bonded" with the Yateses and should be allowed to see them regularly. Johnson admitted that there were a few concerns about appellant: (1) she was still pretty dependent on her family; (2) she was not working, but she had just had a baby; (3) she did not have a driver's license. Johnson stated that she would like to see appellant move toward some more independence.

On cross-examination, Johnson stated that appellant's housing was "appropriate for now." She said that appellant needed additional time to gain the independence needed to take care of two small children, one of whom had special needs. She noted that H.S. had to go to therapies three times a week and that appellant was dependent on Denise for transportation. She conceded that appellant had nothing to do with the injuries sustained by H.S. at the hands of Jarid. She stated H.S. was not returned to appellant once she separated from Jarid because DHS wanted to see a period of stability on the part of appellant. Johnson testified that appellant had not called weekly, as ordered. She also stated that she had no idea if appellant had been on medications and that she was unaware of any medications appellant was taking. Johnson said that appellant's housing was stable but that it was not independent. According to Johnson, DHS would prefer independent housing.

She said that appellant had not had stable employment, but that appellant was pregnant throughout the case.

Johnson also said that DHS had some trouble with appellant being able to demonstrate an ability to protect H.S. because there had been some unexplained injuries to H.S.: (1) a handprint on H.S.'s leg, which led to supervised visitations by Denise being stopped;[6] (2) pictures reflecting red marks on H.S.'s back on a couple occasions; (3) a busted lip (broken skin on the lip) and red ear. According to Johnson, these were all injuries reported by Sonia after H.S. returned from visits with appellant. Johnson said that she asked appellant about the injuries but appellant did not know how they happened. She testified that Sonia was currently taking H.S. to therapy three times a week, and that appellant did not participate in those therapies. However, she stated that she would not object to appellant being able to attend the therapy sessions.

On recross-examination, Johnson said that she was unaware that appellant had taken pictures of H.S. on the day Sonia reported the busted lip, and that the pictures showed no injury.

Appellant testified that she lived in an apartment attached to her parents' home with her one-month old daughter. She stated that DHS had not expressed any concerns about her ability or the manner in which she cared for her newborn and/or H.S. She testified that she had not contacted her doctor about her medications because she had only recently gotten back on Medicaid. She stated that she was unemployed at the time, but that she had not been cleared by her doctor to return to work. She said that her parents were financially

---

[6] There was a true finding of abuse; however, the offender was unknown.

SLIP OPINION

supporting her at the time. Appellant testified that she took pictures of H.S. fifteen minutes before returning her to Sonia, and that there were no injuries to H.S. at that time or when Sonia took H.S. out of the car. She stated that she also had concerns about H.S.'s unexplained injuries. She testified that in July, she noticed bite marks on H.S. during a visit at DHS, but was not allowed to take pictures of the marks with her phone. She stated that Johnson told her that H.S. had gotten mad and bitten herself. Appellant testified that she was in the process of divorcing Jarid and that she had not had any contact with him since their last separation in April. She stated that she was working on getting her driver's license. She opined that H.S. should be returned to her custody immediately. However, she stated that if H.S. was not returned to her that day, she would not oppose a slow transition into the home. She stated that her living arrangements were safe and appropriate for H.S. to return to her and that she wanted to remain where she was living. Appellant agreed that she should be given unsupervised visitation with H.S. if H.S. was not returned to her at the end of the hearing.

On cross-examination, appellant admitted that she had worked several jobs and lived in several different places since the beginning of the case. However, she stated that she had not lived anywhere but her parents' house since April. She also stated that there had not been a time when she lived alone and that she had not worked at any job longer than six months. Appellant said that she had a lot of anger toward her family and that she took anger-management classes to help her resolve those issues. She testified that she had grown up in a mentally abusive family environment and thought that anger-management classes would also help her deal with that. She stated that she took pictures of H.S. during visitation

in order to protect herself from being accused of injuring H.S. Appellant said that she would like to attend therapies with H.S. and that Denise would provide her with transportation. She also stated that if H.S. was returned to her custody, Denise would help ensure that H.S. made all of her appointments.

On redirect, appellant stated that she had some concerns about H.S.'s chronic diaper rash. She said that she did not understand how it would clear up and then get worse. She testified that she did not do anything to cause the diaper rash.

Upon questioning by the court, appellant stated that she had not contacted her doctor for medication because she had only recently received her Medicaid after it had been canceled. She said that she learned she was pregnant after H.S.'s injury, so she had applied for Medicaid due to her pregnancy. She opined that she probably went four months without Medicaid because she had not kept up with it and it had expired. She stated that she understood that H.S.'s therapies were dependent upon Medicaid and that if she did not keep it active, H.S. would not be able to continue therapy. Appellant stated that she had been prescribed Lexapro but that she had to discontinue it while she was pregnant. She said that she needed to make a doctor's appointment to restart it. Appellant admitted that April was not the first time she and Jarid had separated.

Sonia testified that she was currently caring for H.S. She stated that H.S. attended therapy three times a week and that she would not object to taking appellant to some of those therapies. She said that H.S. was doing very well although she had some delays. She stated that H.S. needed additional tests and evaluations. Sonia stated that she had some concerns about H.S.'s diaper rash, which she said started while H.S. was attending the

Elizabeth Richard Center.  She said that H.S. had recently been seen by the doctor for the diaper rash.  She stated that she would almost get the diaper rash cleared up, but that H.S. would return from visitation with appellant with diarrhea and she would have blisters by Monday.  Sonia testified that H.S. returned from one visit with appellant with a busted lip that was not visible from the outside.  She stated that she put "a little bit of chapstick on it" and contacted appellant.  She said that appellant denied knowing about the lip injury and insisted that it did not happen at her house.  Sonia stated that she could continue to have H.S. at her home if that was the court's order.

Upon questioning by the court, Sonia stated that H.S. had been with her since December 2014.  She testified that H.S. was on ARKids, which Sonia got restarted under her name after it had lapsed.  She said that H.S. and S.S.[7] would do pretty well together when S.S. came with appellant.

Denise testified that appellant lived in an add-on attachment to Denise's house.  She stated that the diaper rash had been an ongoing concern since H.S. was placed with Sonia.  She said that Sonia's explanations for the rash had continued to change.  Denise testified that she had never seen a diaper rash like the one H.S. had in terms of the length of time.  She stated that she was afraid the rash would leave scarring on H.S.  She denied that she and appellant were responsible for H.S.'s diaper rash.  She testified that there had been maybe two weeks since H.S. was placed with Sonia that H.S. did not have a "full-blown diaper rash."  She stated that the diaper rash was so severe that it would bleed.  She said that they had begun taking pictures of the diaper rash to prove that H.S. had the rash when they

---

[7] Appellant's daughter born in July 2015.

picked her up for visitation. Denise testified that she and appellant had complained to DHS about the diaper rash at least five or six times. Denise denied that H.S. had a busted lip when they returned her to Sonia following visitation. However, she stated that she was "very concerned" about the unexplained injuries to H.S. She testified that she and appellant had begun taking pictures of H.S. during visitation in order to protect themselves against claims of abuse.

Denise stated that appellant had a safe and appropriate place for H.S. and that appellant was ready for H.S. to live with her full time. She admitted that appellant would need some help, but stated that she was willing to provide appellant with that help. She also stated that she and Carlous could continue to support appellant financially until appellant was able to return to work or go back to school. She testified that they added on to their home so that they could provide appellant with the help she needed. Denise stated that H.S. should be returned to appellant soon so that appellant, H.S., and S.S. could get adjusted. She opined that "going back and forth with visitation [was] disruptive."

On cross-examination, Denise stated that she did not believe that H.S. was being cared for adequately in the Yateses' household. She said that even if the court decided not to return H.S. to appellant at the conclusion of the hearing, H.S. should be removed from the Yateses' home and placed somewhere else. She testified that she had a flexible work schedule and would be able to transport appellant and H.S. to the therapies.

On redirect, Denise testified that she tried to report her concerns about Sonia's care of H.S. to the "hotline," but was told that a report would have to be made to DHS since

there was already an open case. She stated that she was willing and able to take custody of H.S. if the court did not return H.S. to appellant.

Upon examination by the court, Denise testified that she and appellant "had a falling out" at the beginning of this case because she was upset with appellant for staying with Jarid. However, she stated that "it got patched up," and appellant moved back home with them. Denise admitted that appellant had left Jarid more than once and had gotten back with him. She stated that appellant was in the process of filing for a divorce and that appellant had not had any contact with Jarid.

In the PPH order filed on September 18, 2015, the court changed the goal of the case to permanent custody with the Yateses and closed the case. The court found that appellant was not a fit parent, had not complied with the case plan and court orders, and was not making significant and measureable progress toward achieving the case goal of reunification. More specifically, the court found that appellant had not (1) maintained stable housing or employment (multiple moves and changed jobs frequently), (2) obtained a driver's license, (3) maintained weekly contact with DHS, or (4) taken her mental-health medications as prescribed (allowed Medicaid to lapse). The court further found that appellant had demonstrated continued instability in her relationship with Jarid and had failed to demonstrate an ability to protect H.S. and keep her safe from harm. The court noted that appellant had made some progress but that it was not enough to continue reunification as the goal of the case. It found that it was in H.S.'s best interest to be placed in the permanent custody of the Yateses because she had special needs and required stability and permanency. The court granted appellant four hours of weekly supervised visitation and

permitted her to attend therapies with H.S. Appellant filed a timely notice of appeal, and this appeal followed.

In dependency-neglect proceedings, the standard of review on appeal is de novo, although we do not reverse unless the trial court's findings are clearly erroneous.[8] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.[9] We give due deference to the superior position of the trial court to view and judge the credibility of the witnesses.[10] This deference to the trial court is even greater in cases involving child custody, as a heavier burden is placed on the trial judge to utilize to the fullest extent his or her powers of perception in evaluating the witnesses, their testimony, and the best interest of the children.[11]

On appeal, appellant argues that the court erred in placing H.S. in the permanent custody of the Yateses because she had made significant and measureable progress towards remedying issues that caused the removal of H.S., and DHS, CASA, and the attorney ad litem recommended an additional three months to transition H.S. into appellant's home pursuant to Arkansas Code Annotated § 9-27-338(c)(3).[12] She contends that she completed

---

[8] *Ingle v. Ark. Dep't of Human Servs.*, 2014 Ark. 471, 449 S.W.3d 283.

[9] *Id.*

[10] *Mosher v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 111, 455 S.W.3d 367.

[11] *Callison v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 592, 446 S.W.3d 210.

[12] Allows a court to authorize a plan to place custody of the juvenile with a parent if the court finds that the parent is complying with the established case plan and orders of the court, making significant measurable progress toward achieving the goals established in the

all of her counseling and that she even voluntarily sought counseling for her anger issues. She acknowledges that she had "several jobs at the beginning of the case," but points out that she was pregnant throughout the case and had just given birth a month before the PPH. Appellant argues that she proved that she could provide financially for her children by providing for S.S., without a job, with help from her parents. She also contends that she obtained safe and stable housing, although it was not independent. Essentially, what appellant is asking this court to do is to reweigh the evidence in her favor. However, a de novo review of the record reveals that the court's findings are not clearly erroneous.

Next, appellant argues that the court erred because permanent custody with the Yateses was not in H.S.'s best interest where there were serious questions about the care H.S. was receiving in the Yateses' home, and where H.S. would be separated from a full-blood sibling. The court heard testimony concerning the unexplained injuries to H.S. and the chronic diaper rash. At the conclusion of the hearing, the court found that it was in H.S.'s best interest to remain with the Yateses so that she could obtain permanency and stability. Giving due regard to the court's opportunity to judge the credibility of the witnesses, we cannot say that the court erred in awarding permanent custody of H.S. to the Yateses. We note that the sibling argument was not raised below and is not preserved for our review.[13]

---

case plan and diligently working toward reunification or placement in the home of the parent.

[13] *See Johnson v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 537 (holding that the failure to raise issues or to obtain rulings at the trial level precludes appellate court consideration of the issue on appeal).



Affirmed.

Virden and Hixson, JJ., agree.

*Leah Lanford*, Arkansas Public Defender Commission, for appellant.

*Jerald A. Sharum*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by:  *Keith L. Chrestman*, attorney ad litem for minor child.